# HOUSE *vs.* CAMP.

[ACTION FOR FORCIBLE ENTRY AND DETAINER.]

1. *Description of premises in complaint.*—" A certain house and lot in the city of Wetumpka in said county, in that part of said city known as ' Miller's survey,' being known as the east half of lot number 21 in said survey, on which is a house recently occupied by Mrs. B. M. D.,"—held a sufficient description of the premises sued for.

2. *Description of premises in judgment entry.*—When the complaint contains a sufficient description of the premises sued for, an insufficient description in the judgment entry, aided by a reference to the antecedent description in the record, is also sufficient.

3. *Description of plaintiff's estate in complaint.*—An averment in the complaint, that the plaintiff "was lawfully possessed" of the premises sued for, "was in possession, and claimed said premises as tenant under one B. M. D., and had been in possession of said premises for the space of six months previous thereto," is a sufficient description of the plaintiff's estate.

4. *Objection to competency of deceased witness.*—When the deposition of a deceased witness, which had been suppressed, is offered to prove what the witness had sworn on a former trial, the party against whom it is offered may object to it on account of the incompetency of the witness, although the deposition was offered by himself on the former trial.

5. *Competency of landlord as witness for tenant.*—In an action of forcible entry and detainer, commenced before the adoption of the Code, against one who claims adversely to the plaintiff's landlord, said landlord is not a competent witness for the plaintiff.

6. *What title will support action.*—A party in possession of a house and lot, under an agreement with the owner to keep possession of the same, together with some articles of household furniture, until demanded, has such an interest as will support an action of forcible entry and detainer.

7. *What possession will support action.*—Where the plaintiff did not reside on the premises sued for, but claimed to hold them as tenant at will or sufferance for the owner, neither the fact that he had wagons and straw-cutters in the house, nor the fact that another person also had there wagons and other implements of his trade, nor the fact that yet another person, with his family, was living there temporarily, nor all these facts together, authorize the court to announce, as a legal conclusion, that the plaintiff did not have such possession as would enable him to maintain the action.

APPEAL from the Circuit Court of Coosa.

Tried before the Hon. JOHN GILL SHORTER.

THE original complaint in this case was in these words: "Edward Camp, of said county, complains, that he was lawfully possessed of a certain house and lot situated in the city of Wetumpka, in said county, and in that part of said city known as 'Miller's survey,' being known as the east half of lot No. 21 in said 'Miller's survey,' on which is a house recently occupied by Mrs. B. M. Dixon; and that while complainant was so lawfully and quietly possessed of said house and lot, at to-wit, in said county, on the 24th December, 1851, Samuel W. House, of said county, forcibly entered upon and detained complainant from said described premises; and complainant says, that he was in possession of, and claimed said premises, as ten-

ant under said B. M. Dixon, and had been in possession of said premises for a long time previous thereto, to-wit, for the space of six months. Whereupon he prays process to be issued, in accordance with the statute, against said Samuel W. House, for forcible entry and detainer."

On the trial before the justice of the peace, the plaintiff recovered a verdict and judgment, and the defendant removed the case to the circuit court. On the trial in the circuit court, as appears from the bill of exceptions, "the plaintiff offered evidence tending to show that, on the 24th December, 1851, he had some lumber, several strawcutters, and some pieces of buggies, in the house once occupied by Mrs. B. M. Dixon in Wetumpka; that he directed some shingles to be put into the house on that day; that while the shingle-man was engaged in unloading the shingles, and putting them in at the window of the house, the defendant came up, and ordered him to stop; that the man replied, 'Camp told me to put them here;' that the defendant refused to let it be done, saying that Camp had no right to the house; that the man then went to Camp about the matter, and, on coming back, said, 'Camp says throw them on the ground there if he (defendant) will not let you put them in the house; that the defendant refused to let this be done, took hold of the shingle-wagon, and backed it off the lot, and said, that if Camp fooled with him, he would kick him; that Camp was not present when these things happened, but was standing in sight, on his own lot, some fifty yards distant, where he lived; that the defendant then caused the shingles which had been put in to be thrown out of the house, and notified Camp, if he had anything in that building, to remove it, as he was going to shut it up; that Camp refused to do so, and said to defendant, 'I forewarn you not to do it;' that the defendant then caused Camp's said property, with some other property in there belonging to one Kennedy, to be removed out of the house; that he also notified one White, who, with his family, was temporarily in there waiting for a boat, that they must move out, and furnished him with his dray and mules to remove his family, and removed him to plaintiff's house; and that he

then nailed up the windows, and locked the door. The evidence tended to show, also, that certain hog-drivers and a Mr. Semple had been admitted into the house by plaintiff, a few days before he was ejected by the defendant; and that the plaintiff had frequently used the house, going in and out, in October and November, 1851, and taking lumber from it for use in a building which he was erecting. The plaintiff then rested his case."

" The defendant then offered evidence tending to show, that the house in question was standing open and unoccupied in the summer of 1850; that while it was thus situated, witness saw defendant nail up the windows and doors; that the house remained in this condition until the spring or summer following, when defendant was about leaving home for some months; that defendant, before leaving, requested one Kennedy, a witness, to give such attention to his affairs about his house and lot as might be required; and that this house was an old out-building, near defendant's lot, and about the same distance from plaintiff's lot. Said Kennedy further testified, that after the defendant left home, as above stated, he wanted a place to paint wagons, &c.; that under the general authority which he had received from defendant, and without plaintiff's permission, he took the liberty of opening the house, and using it for that purpose; that on opening the windows and doors, he found the house entirely empty, except a pantry, or cupboard, attached to the wall in one of the rooms; that he put his wagons, paints, paint-pots and lumber into the house, in May, 1851, and painted them there for several weeks, and then left them standing there. But one witness swore, that he was present, and heard Kennedy, before he went into the house, tell Camp that it was too hot to paint in the sun, and ask Camp's permission to go in the house, which was granted. These things remained there until the 24th December, 1851, and were then removed by witness and defendant, as before stated. When defendant returned, about September, 1851, Kennedy told him what he had done with the building, and defendant made no objection to it. In November, 1851, plaintiff and witness had a conversation, in

which witness said, that he had an idea of renting the house from the defendant for the next year; to which plaintiff replied, 'I do not know that he has any right to it; I have been examining the records, and find that he purchased a small interest at a tax-sale; and I believe I will take possession of it myself.' Witness applied to the defendant, on the next day, to rent the building for the next year; but defendant declined to rent it to him, saying that the purpose for which he wished to use it would injure the ceiling. On the next morning, witness found the door of the building locked with a pad-lock. He went to defendant, to know if he did it, and was informed that he did not. He then sent to plaintiff for the key, as he wished to enter to sell a wagon; and plaintiff sent him the key. On entering the building, witness found there for the first time the lumber, straw-cutters, pieces of buggies, &c., before spoken of. (It was shown, however, that plaintiff had lumber there in October.) These things remained there until the 24th December, 1851. After he had shown the wagon to his customer, witness sent the key back to plaintiff, and, from that time forward, sent to him for the key whenever he wanted to enter the building. The building was standing on an unenclosed lot. When White wished to obtain a place to move into with his family, household furniture, &c., witness told him to go into that building—that he could stay there until a boat came, (White was moving to Texas with his family,) and that Camp would let him have the key. The evidence tended to show, also, that plaintiff and defendant had both given permission to persons to occupy said house, but not that defendant had given permission to White to go into it. There were three rooms in the house, all of which communicated with each other by doors; in two of which rooms, on said 24th December, 1851, said Kennedy had the property before spoken of. White and his family were in there, waiting the arrival of a boat, the river being very low; and the lumber, straw-cutters, &c., which Camp claimed, were in there.

"The plaintiff then offered to prove what Mrs. B. M. Dixon had sworn, in answer to certain interrogatories and

cross interrogatories, under a commission by the justice of the peace while the cause was pending before him; and for that purpose, offered said deposition in evidence." "The defendant then showed, by the minutes of this court, that said deposition had been suppressed by an order of court at a former term; but the minutes did not show upon what ground. Thereupon the court refused to allow the deposition to be read. The plaintiff then called one of the two commissioners by whom said deposition had been taken, and proved by him, that Mrs. Dixon was sworn in his presence, when her said deposition was taken, and that she was now dead; and called on said witness to state, if he recollected the substance of her deposition. The defendant objected, because said witness (Mrs. Dixon) was interested and incompetent; and, to show to the court that she was interested, proved by said witness that, in answer to a question, she said that she delivered the possession to plaintiff, to keep for her until she demanded it. The defendant objected to proof of what said witness swore, also, because it did not affirmatively appear that she was sworn according to law, and because said commissioner did not administer the oath to her, nor examine her, nor write down her answers; and, in support of his objection, proved these facts by said commissioner. But said commissioner also testified, that the other commissioner administered the oath to Mrs. Dixon; that she was sworn to answer truly the interrogatories propounded to her; that said commissioner wrote down her answers, in her own language, and read them over to her twice or thrice; and that she approved them, and signed them in their presence. The court overruled all the defendant's objections, and allowed said witness to testify to what Mrs. Dixon had sworn on that examination; and the defendant excepted. The witness then read over her answers, or they were read over to him by the plaintiff's counsel, in open court, to refresh his recollection; and he then said, that she swore what was there stated. Thereupon said statements were read to the jury, as the statement of the witness as to what she swore; and the defendant excepted."

The defendant asked the following charges to the jury:

" 1. That if Mrs. Dixon left this property with Camp, together with the articles of household furniture, to keep possession for her, without paying rent, until she demanded it, then Camp cannot recover, so far as any right derived from her is concerned.

" 2. That if the jury believed that Camp had some parts of wagons, a straw-cutter, &c., in the house on the 24th December, 1851; and that Kennedy also had there wagons, carry-alls, paint-pots, brushes, &c.; and that White and his family were living there at the same time,—then Camp had not such possession as would enable him to recover in this action.

" 3. That if the jury believed from the evidence that the defendant nailed up this building in the summer of 1850, or in September of that year; and that it remained so until Kennedy opened it, and put in wagons to paint, and painted them there in the summer of 1851; and that they remained there, with the defendant's consent, until the 24th December, 1851, and were there on that day; and that the only possession the plaintiff had on that day was by putting his things in the house, and putting a lock on the door, while Kennedy had his things there, as stated by him,—then the plaintiff had not such possession as would enable him to maintain this action."

The court refused each of these charges as asked, but gave the third with this qualification: "But, if the evidence showed that the plaintiff, in the early part of the year 1850, had taken possession of the house under Mrs. Dixon, and had not abandoned it; and that Kennedy put his paints and wagons in there by the permission of the plaintiff; and that White was in there, merely waiting for a boat, by the permission of the plaintiff,—then the plaintiff had such possession as would enable him to maintain this action." The defendant reserved exceptions, as well to the refusal of the charges asked, as to the qualification annexed to the charge given.

The jury returned a verdict for the plaintiff, and thereupon the court rendered the following judgment: " It is

therefore considered by the court, that the plaintiff have judgment of restitution to the said lot, or parcel of land, to-wit, the east half of lot No. 21 in 'Miller's survey' in the city of Wetumpka, Coosa county, Alabama; and that the sheriff of said county put the said plaintiff in possession of the same." There is an agreement of record, that a motion in arrest of judgment was submitted by the defendant, and an exception reserved by him to the overruling of said motion; and that said motion may be considered to have been predicated on any ground shown by the record.

The assignments of error embrace all the rulings of the court to which exceptions were reserved.

Parsons & J. White, for appellant.

Jno. T. Morgan, contra.

WALKER, J.—The complaint describes the premises as "a certain house and lot situated in the city of Wetumpka in Coosa county, in that part of said city known as 'Miller's survey,' being known as the east half of lot No. 21 in said Miller's survey, on which is a house recently occupied by Mrs. B. M. Dixon." It appears from this description that there is a portion of the city of Wetumpka, in Coosa county, known as Miller's survey; and that there is a lot in that survey known as lot No. 21, which was occupied, not long before the commencement of the suit, by Mrs. B. M. Dixon. The points of description are sufficient to identify the land with sufficient certainty to inform the defendant what was claimed, and to enable the sheriff to deliver possession without danger of trespassing on other lands. The sheriff would only have to find a known survey in the city of Wetumpka, and in Coosa county, and a lot of known and designated number in that survey, in order to ascertain the lands. This he could do without difficulty. If the survey is not "known," and the lot is not "known" in the survey by its number, it might be brought forward as a defense to the suit.—Wright v. Lyle, 4 Ala. Rep. 112; Hilliard v. Ketchum, 6 Ala. 557.

[2.] The description in the judgment, aided as it is by a reference to the antecedent description in the record, is also sufficient.

[3.] Upon the authority of McRae v. Tilman, 6 Ala. 486, we hold the description of the complainant's estate in the complaint to be sufficient.

[4.] The deposition of Mrs. Dixon, as a *deposition* in the cause, was inadmissible, because it had been suppressed, if for no other reason. When offered to prove what a deceased witness had sworn, by analogy to the proof of what a deceased witness swore on a former trial, the defendant had a right to object to the evidence, upon the ground that the witness was incompetent from interest. The party against whom the testimony of a deceased witness on a former trial, or in a former investigation, is offered, is allowed to make every objection which could be made, if the witness were in life, and personally offered as a witness for the first time.—1 Greenleaf on Ev. § 163, and note 1; Carey v. Sprague & Craw, 12 Wendell, 41. When evidence is offered of the testimony of a deceased witness, the objection for incompetency may be made, even though the testimony may have been given in by the witness of the objecting party on the previous examination.—Carey v. Sprague & Craw, *supra*.

[5.] It appears from the complaint, as well as from the testimony of the witness herself, that the complainant was holding under her, and as her tenant; and it appears that the defendant was claiming the possession adversely to the witness. The witness would necessarily be prejudiced by the defendant's recovery in the case, because her right of possession in that event would be adjudged against a tenant holding under her and for her, and she would thus lose the possession of the land which she held through her tenant.—1 Greenleaf on Ev. § 392; Jackson v. Stackhouse, 1 Cowen, 122; Doe v. Clark, 3 Bingham's N. C. 429; Smith v. Chambers, 4 Esp. 164.

As this suit was commenced before the adoption of the Code, the competency of the witness does not depend upon the law found in it.

The court erred in not sustaining the objection on the ground of interest to the testimony of Mrs. Dixon.

[6.] There was no error in the refusal to give the first charge asked. If the complainant was in the possession of the premises, under an agreement to keep possession of them, together with some articles of household furniture, for Mrs. Dixon until demanded, he had such an interest as would enable him to bring the suit. All that is necessary to the maintenance of the action is, that there should be a holding by some tenure, which by law entitled the party to the possession, which is the only matter to be inquired of.—McRae v. Tilman, 6 Ala. R. 486. A mere tenant at will may maintain the action.—McDonald v. Gayle, Minor, 98.

[7.] We think the second charge asked was also properly refused. The facts presented in the charge do not negative Camp's possession. Neither the fact that Camp himself had wagons and straw-cutters in the house, nor the fact that Kennedy had wagons, carry-alls, paint-pots, and brushes in the house, nor the fact that White and his family were living there, nor all of those facts together, would authorize the court to announce, as a legal conclusion, that Camp was not in possession. Kennedy may have put his articles in the house by the permission of Camp, without taking, exercising or claiming any control over the house; and so White and his family may have been in the house by the permission of Camp, with the understanding that Camp still retained the control and possession of the premises, while they had only such occupancy as a boarder has in a hotel, where he may temporarily sojourn. If such was the case with regard to the occupancy of Kennedy, and of White and his family, they would not destroy the possession of Camp, or deprive it of the character requisite to the maintenance of the suit.

For the same reason, upon which we approve the refusal of the court to give the second charge asked, we decide that there was no error in the qualification by the court of the third charge asked.

The judgment of the court below is reversed, and the cause remanded.